Donald E. **HALL** et ux.

v.

**BOARD OF ENVIRONMENTAL PROTECTION.**

Supreme Judicial Court of Maine.

Argued March 14, 1985.

Decided Sept. 4, 1985.

argument is a factor to be considered in evaluating the degree of prejudice to the Defendant.

Pierce, Atwood, Scribner, Allen, Smith &
Lancaster, Daniel M. Snow (orally), John D.
Delahanty, Portland, for plaintiff.

Gregory Sample (orally), Bd. of Environmental Protection, Augusta, Jeffrey A. Thaler, Nancy C. Anderson, Maine Audubon Soc., Falmouth, for amicus curiae defendant.

Before McKUSICK, C.J., and NICHOLS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

NICHOLS, Justice.

The Plaintiffs, Donald Hall and Virginia Hall, appeal from a judgment entered by the Superior Court (Sagadahoc County) dismissing their M.R.Civ.P. 80C review of a decision of the Board of Environmental Protection. The Board had denied the Plaintiffs' after-the-fact application to construct a seasonal cottage in Phippsburg. Further, the Superior Court granted the Defendant's motion to dismiss the Plaintiffs' independent causes of action, Count VI alleging an unconstitutional taking of property and Count VII alleging estoppel. Finding error in such dismissal of Count VI, we sustain that portion only of their appeal.

The Plaintiffs, a New Hampshire couple, own two adjacent lots of real estate at Hunnewell Beach in Phippsburg. Until November, 1976, the Plaintiffs owned only one of these lots, upon which there was a cottage. The adjacent lot and a cottage situated on it had been owned by the Snyders, a Pennsylvania couple, who in November 1976, conveyed their lot to the Plaintiffs.

Because of continuous shoreline erosion, twenty dwellings were destroyed or removed from Hunnewell Beach between 1974 and 1977. During the fall and winter of 1976, both the Snyder cottage and the Plaintiffs' original cottage were substantially damaged by this erosion. Both cottages were dismantled and removed from the lots in 1977. Since that removal, a large ridge of sand has drifted onto the intertidal area, causing Hunnewell Beach to grow by accretion.

On August 3, 1982, the Plaintiffs obtained from the Town of Phippsburg a building permit and an internal plumbing permit to construct a cottage on the former Snyder lot. In their petition for review, the Plaintiffs alleged that prior to obtaining these permits, Plaintiff Donald Hall asked the Phippsburg code enforcement officer whether any state permit was required to rebuild the cottage, and that the code enforcement officer specifically responded that no state permit would be required.

Thereafter, between August, 1982 and mid-November, 1982, the Plaintiffs undertook and completed most of the construction of a 20' × 30' cottage set on 18 concrete posts, with an attached 8' × 18' porch set on 8 posts. The new cottage is located approximately 40 feet landward of the former Snyder cottage. At the time construction was discontinued for the winter, the cottage was substantially completed.

In December, 1982, the Plaintiffs received a letter from the Department of Environmental Protection informing them that it would be necessary to apply for a permit for construction under the "Sand Dune Law," 38 M.R.S.A. § 471 (Pamp. 1984–1985).[1] This letter was the first communication between the Department and the Halls with respect to their new cottage.

On December 30, 1982, Plaintiff Donald Hall filed an application for the required Sand Dune Permit. On April 1, 1983, the Plaintiffs filed a report prepared by Barry S. Timson, a Maine Certified Geologist, amending the application and describing its potential impacts on the beach and dune environment. The report amended the application in two respects: (1) by requesting authorization to construct an artificial dune directly in front of the cottage; and (2) by stipulating that the cottage and porch

---

1. Section 471 provides:
   No person shall ... bulldoze, remove, add or displace sand, or build any permanent structure in, on or over any coastal sand dune without first obtaining a permit therefor from the Board of Environmental Protection or a municipality acting under the provisions of sections 473 and 474....

structure would be removed from the property if 50% or more of the structure were undermined by future erosion.

On April 27, 1983, the Defendant Board denied the Plaintiffs' amended application for a Sand Dune Permit. The Plaintiffs did not seek any administrative or judicial review of that decision.

On May 26, 1983, Plaintiff Donald Hall filed a new application with the Board, which differed from the earlier amended application in several respects:

a. The cottage would be reset on four (4) posts driven to a depth of 0' NGVD;

b. The cottage would be raised to sit on the posts at least 4 feet above the existing dune surface;

c. The area around and underneath the cottage would be planted with American beach grass; and

d. A temporary (seasonal) boardwalk would be installed for foot passage over the dunes from the cottage to the beach

As part of the new application, the Plaintiffs submitted a new report by Geologist Timson.

During June 1983, the Department staff processed the application by soliciting and gathering information about the proposed project, and comments upon it, from various sources. On the Plaintiffs' behalf, Mr. Timson responded to the comments of others, including by amending the application on June 14, 1983, an increase in the number of pilings upon which the cottage would be set from four (4) to twelve (12).

In preparation for the Board meeting scheduled for June 22, 1983, the Department staff prepared in handwritten form two alternative orders—one recommending conditional approval of the project and the other recommending denial of the permit. On June 15, 1983, the order recommending conditional approval was typed and mailed to all Board members, along with other materials relating to matters on the agenda for the meeting. The draft order recommending denial of the permit was not typed or presented to the Board. A copy of the order recommending conditional approval was also mailed to the Plaintiffs' attorney on June 15, together with notice that the staff would request that the application be tabled by the Board to enable receipt and review of further comments. At its meeting of June 22, 1983, the Board tabled the application until its next meeting on July 13, 1983.

On June 30, 1983, the Department staff prepared a new draft decision recommending denial of the application.

On July 6, 1983, by a letter from Geologist Timson, the Plaintiffs further amended their application. The amendment provided that the cottage would be constructed to be "resistant to a 100-year storm," using the services of a Portland engineering firm.

At its meeting on July 13, 1983, the Board of Environmental Protection heard testimony from agents of the Plaintiffs as well as others who had commented on the application. The proceedings were tape recorded and transcribed. After hearing these presentations, the Board adopted, with some modifications, the "Findings of Fact and Order" recommended by the staff, denying the Plaintiffs' application for a sand dune permit.

Pursuant to M.R.Civ.P. 80C, the Plaintiffs filed in the Superior Court a petition for review of the Board's decision. In the same complaint the Plaintiffs also set forth two independent claims for relief: (1) unconstitutional taking of property; and (2) estoppel. The Superior Court affirmed the Board's decision and granted the Defendant's motion to dismiss the two independent claims for relief. Thereupon the Plaintiffs appealed to this Court.

## I.

■ At the outset the Plaintiffs argue that because their application met the requirements of Subsection 2.B.5 of the Department's Sand Dune Regulations, the Board erred as a matter of law in denying their application.

It is unclear from the Sand Dune Regulations themselves whether the Plaintiffs' cottage indeed qualifies as a "rebuilding" of a severely damaged building. Subsection 2.B.5 of the Sand Dune Regulations provides only that "[a] building is severely damaged when the damage exceeds 50% of the appraised value of the building;" the regulation then specifies the circumstances in which such a building can be rebuilt. The parties stipulated that both the Plaintiffs' original cottage and the Snyder cottage (which was located 40 feet seaward of the Plaintiffs' present cottage) were "substantially damaged." Moreover, the regulations do not expressly preclude a newly constructed cottage replacing a previously removed cottage from being classified as "rebuilt."

On the other hand, language in the record indicates that the Plaintiffs contemplated an entirely new venture. The Plaintiffs did not use the word "rebuild" in their applications. Similarly, the Board denied the Plaintiffs' application "to construct a ... dwelling." In addition, Subsection 2.B.5 provides that before one can rebuild a severely damaged building, the building must be *"relocated* as far outside the A-zone or V-zone as possible." (emphasis added). The subsection also specifies the consequences when a "building *cannot be moved* entirely out of the A and V flood zones." (emphasis supplied). Such language would suggest that "rebuilding" is construction work being done on a severely damaged *original* building.

However, we need not determine whether the Plaintiffs' cottage is a "new building" or the "rebuilding of a severely damaged building." Even if the Plaintiffs *have* met all of the requirements of Subsection 2.B.5, this subsection is not the *exclusive* criteria for the Board's decision on permits. A reading of the entire Sand Dune Regulations shows that Subsection 2.B.5 is to be read in conjunction with Subsection 2.A, which is entitled "All Projects." The subsection provides in pertinent part:

1. Projects shall have a minimal impact on the immediate site and on the sand dune system. Impacts which may reasonably be expected to occur during the following 100 years will be considered. In areas where substantial portions of the dune system remain unaltered, special attention will be paid to the cumulative impacts of activities on the dune system.

2. Projects shall not be permitted if, within 100 years, the project may reasonably be expected to be damaged as a result of changes in the shoreline.

3. Projects shall not cause a flood hazard to any structure during a 100 year flood or storm.

In its "Findings of Fact and Order" denying the Plaintiffs' application, the Board relied primarily on the considerations of the subsection as the reasons for its decision.

Thus, the requirements of Subsection 2.B.5 are not exclusive as the Plaintiffs argue; they are only additional, specialized standards for rebuilt cottages. Rebuilt cottages, as well as all projects, must meet the more general standards of Subsection 2.A. Consequently, even if the Plaintiffs' cottage is "rebuilt" and meets the requirements of Subsection 2.B.5, the Board was not compelled to grant the permit on that basis.

## II.

38 M.R.S.A. § 474(2) (Pamph.1984–1985), the statute under which the Board acted to deny the Plaintiffs' application, provides:

2. If the applicant for a sand dunes permit demonstrates to the satisfaction of the board or municipality, as appropriate, that the proposed activity will not unreasonably interfere with existing recreational or wildlife uses; unreasonably interfere with the natural supply or movement of sand within or to the sand dune system; unreasonably increase the erosion hazard to the sand dune system; or cause an unreasonable flood hazard to structures built in, on or over any coastal sand dune or neighboring property, the

board or municipality shall grant the permit upon such terms as are necessary to insure that the proposed activity will comply with the foregoing standards.

In its "Findings of Fact and Order," the Board stated that the Plaintiffs' project failed to comply with all but one of the statutory criteria (i.e., the Board found that the Plaintiffs' project would not unreasonably interfere with existing wildlife uses). The Superior Court upheld the Board's decision.

On appeal, the Plaintiffs contend that the Board misinterpreted the statutory term "unreasonable" and that its misinterpretation of that term led to a decision unsupported by substantial evidence. In particular, the Plaintiffs stress that: (1) upon the advice of one Board member, who suggested that they needed "to protect themselves," the Board inserted the word "unreasonable" into its conclusions; (2) prior to the Board's June 22 meeting the Board staff had prepared a draft order which recommended that the Plaintiffs' application be approved; and (3) the statute prohibits *unreasonable* interference. For these reasons the Plaintiffs argue that because the Board did not have before it substantial evidence that the interference levels were *absurd, irrational, senseless, excessive or beyond the bounds of reason,*[2] the Board erred in denying the application.

█ In reviewing the Board's decision, we use the same standard of review as did the Superior Court, that is, whether the factual findings are supported by substantial evidence on the whole record. *Sebasticook Valley Health Care Facility, Inc. v. State,* 484 A.2d 595, 599 (Me.1984); *Gulick v. Board of Environmental Protection,* 452 A.2d 1202, 1207 (Me.1982). The fact that inconsistent conclusions could be drawn from the record does not prevent the agency's findings from being sustained if there is substantial evidence to support them. *Gulick,* 452 A.2d at 1208; *Seven Islands Land Co. v. Maine Land Use Regulation Commission,* 450 A.2d 475, 479 (Me.1982).

█ After a review of the entire record, we conclude that the Board had before it substantial evidence to conclude that the Plaintiffs' project (1) would unreasonably interfere with the natural supply or movement of sand; (2) would unreasonably increase the erosion hazard; and (3) would pose a flood hazard. Although the Board inserted the word "unreasonable" in its findings of effect on sand supply and of erosion hazard, (and did not use the term "unreasonable" to describe the flood hazard), the three experts associated with the State consistently stressed throughout their letters and testimony that the various risks would be unreasonable. Even the Plaintiffs' own consultant acknowledged that Hunnewell Beach was extremely dynamic and likely to be erosional. Although the record does indeed contain evidence supporting acceptance of the Plaintiffs' application, it is not our function, as a reviewing Court, to reverse the Board's determination when it is supported by substantial evidence.

III.

The Plaintiffs next contend that we should reverse the Board's decision because that decision was affected by bias, and that it was arbitrary, capricious, and characterized by abuse of discretion. In particular, the Plaintiffs assert: (1) that in submitting a pre-hearing summary to the Board, the Board's staff supplied the Board with all of the materials submitted in opposition to the application, but did not include the Plaintiffs' application and many of the supporting materials submitted by their consultant; and (2) that the Board's decision is inconsistent with its decisions on other applications for cottages of similar construction.

A. *Staff Preparation*

█ A week before the Board's July 13 hearing, the staff mailed to the Board members a staff-selected compilation of materials relating to the Plaintiffs' application. This collection of documents con-

---

**2.** *See Websters New International Dictionary,* p. 2789 (2nd ed. 1955).

tained a staff draft document of Findings of Fact and Order, which recommended denial. It also contained several letters from the consultants and one letter from an interested organization. A single letter, one which had been submitted by the Plaintiffs' consultant, supported the Plaintiffs' application. The staff also submitted a summary of review comments on the Plaintiffs' application and modified proposal; no comments of the Plaintiffs' consultant were included.

The Plaintiffs argue, citing *Mutton Hill Estates, Inc. v. Town of Oakland*, 468 A.2d 989 (Me.1983), that this submission, which they contend contained all of the materials supporting denial and very little supporting acceptance of the application, biased the Board and made it impossible for the Plaintiffs to receive a fair hearing.

Although we do not approve of the procedure by which the staff prepared the Board members to take action on the Plaintiffs' application, the resulting bias or unfairness, if any, in this case does not rise to the level that we censured in *Mutton Hill*. In *Mutton Hill*, a town planning board had actively engaged in ex parte fact finding with individuals opposed to granting a developer's permit. In that case, the planning board at its meeting adopted without discussion prepared findings of fact that were developed from the ex parte meetings. 468 A.2d at 991.

On the other hand, in the case at bar, the Plaintiffs were given a full opportunity to present their evidence at the July 13 hearing. As the hearing opened, the Plaintiffs' attorney informed the Board that he felt that the staff's prepared package would bias the Board. The Plaintiffs' consultant extensively explained why the project application met statutory guidelines, and answered questions from Board members. Moreover, we note that at no time during the application process did the Plaintiffs present the Board with a request for a formal hearing. By failing to do so, the Plaintiffs in essence voluntarily waived some of the procedural protections attendant to formal administrative hearings. In light of this we conclude that although the staff did not present the Board with an unbiased compilation, this defect was substantially cured at the July 13 hearing.

## B. *Inconsistent Decision*

On appeal to the Superior Court, the parties were permitted to compile a supplemental record. This record consists of fourteen applications and related materials submitted to the Board for the purposes of obtaining a sand dune permit. In all cases, the Board granted the permits. On appeal, the Plaintiffs contend that the Board applied an entirely different standard to their application, and that its decision denying their application is therefore arbitrary, capricious, and represents an abuse of discretion. In asking us to reverse the Board's decision on this basis, the Plaintiffs urge us to examine the other applications.

We decline to do so. To examine each application would take us, as a reviewing court, far beyond our well-established role of reviewing the administrative record for substantial evidence to support the agency's findings. *See, e.g., Gulick*, 452 A.2d at 1207.

## IV.

As their first independent claim for relief, the Plaintiffs assert that the Sand Dune Law as applied to them constituted an unconstitutional taking under Article I, Sections 6 and 21, of the Maine Constitution and of the counterpart provisions of the federal constitution.

The Superior Court granted the Defendant Board's motion to dismiss pursuant to M.R.Civ.P. 12(b)(6), ruling that the Plaintiffs had failed to state a claim for an unconstitutional taking. The Plaintiffs now contend that this ruling was in error. We agree.

Dismissal of a complaint for failure to state a claim is in order only when it appears beyond doubt that a plaintiff is entitled to no relief under any set of facts that he might prove in support of his claim. *Larrabee v. Penobscot Frozen Foods, Inc.*, 486 A.2d 97, 99 (Me.1984); *MacKerron v.*

*Madura,* 445 A.2d 680, 681–682 (Me.1982). In reviewing such a dismissal, we examine the complaint in the light most favorable to the plaintiff to determine whether it sets forth the elements of a cause of action or alleges facts that could entitle the plaintiff to relief on some legal theory. *Id.*

■ In the case at bar the Plaintiffs assert that without approval of their application for a sand dune permit, the property is rendered substantially useless. That is sufficient to state a claim under which facts could be proved that would entitle them to some relief.[3] Accordingly, so much of the Superior Court's order entered August 17, 1984, as dismissed Count VI of the Complaint must be vacated and the case must be remanded for further proceedings.

The rest of the judgment may stand.

### V.

Finally, the Plaintiffs contend that the Superior Court erred in granting the Board's motion to dismiss the Plaintiffs' second independent claim for relief, which they set forth in Count VII. Therein the Plaintiffs asserted that the Phippsburg code enforcement officer, along with the officials of the Department of Environmental Protection, is responsible for enforcing the Sand Dune Law. They further asserted that because they relied on the representations of the Phippsburg code enforcement officer that no state permit would be necessary to rebuild their cottage, the Board is estopped from denying the Plaintiffs' application for a sand dune permit.

■ The Superior Court committed no error in denying or "dismissing" the Plaintiffs' estoppel claim. Although equitable estoppel may be invoked against a governmental entity in appropriate circumstances[4], there must be a valid reason to believe that the person making the relied upon representation had authority to represent the agency's position. *See Trull*

*Nursing Home, Inc. v. State of Maine Department of Human Services,* 461 A.2d 490, 499 (Me.1983). The Plaintiffs' allegation that the Phippsburg code enforcement officer has responsibility for enforcing the Sand Dune Law is incorrect as a matter of law. The Legislature has expressly provided who may enforce the Sand Dune Law: inland fish and game wardens, coastal wardens, sheriffs, deputy sheriffs, police officers, constables, marine patrol officers, wardens of the Penobscot Indian nation, and special agents of the United States Fish and Wildlife Service. 38 M.R.S.A. § 476 (Pamph.1984–1985) and 12 M.R.S.A. § 7055 (Supp.1984–1985).

The Plaintiffs further alleged two related factual grounds for their estoppel claim. We find no merit to their contentions that the Superior Court erred in "dismissing" the claim for relief on these bases.

The entry is:

So much of the order of August 17, 1984, as dismissed Count VI of the Complaint is vacated.

Remanded for further proceedings consistent with the opinion herein.

All concurring.

---

**3.** *Cf. State v. Johnson,* 265 A.2d 711, 714–715 (Me.1970).

**4.** *Shackford & Gooch, Inc. v. The Town of Kennebunk,* 486 A.2d 102, 106 (Me.1984); *Maine School Administrative District No. 15 v. Reynolds,* 413 A.2d 523, 533 (Me.1980).